[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 26 2000
THOMAS K. KAHN
CLERK

—————————————

No. 99-10593

—————————————

D. C. Docket No. 98-00089-4-CV-HLM

JERRY M. STANLEY,

Plaintiff-Appellee,

versus

CITY OF DALTON, Georgia,
JAMES D. CHADWICK, individually and in his official capacity,

Defendants-Appellants.

—————————————

Appeal from the United States District Court
for the Northern District of Georgia

—————————————
**(July 26, 2000)**

Before EDMONDSON, HULL and WOOD[*], Circuit Judges.

HULL, Circuit Judge:

—————————————

[*] Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

Appellee Jerry M. Stanley, a police officer, brought this § 1983 action against Appellant James D. Chadwick, the Chief of Police, alleging wrongful termination in violation of his first amendment rights.  Chadwick appeals the district court's denial of his motion for summary judgment based on qualified immunity.  We reverse.

## I.  FACTUAL BACKGROUND

We first review the record evidence in the light most favorable to Stanley.  Stanley joined the City of Dalton Police Department in 1977.  In 1993, Stanley was a Lieutenant in the Narcotics Unit and Chadwick was Deputy Chief  in charge of the evidence room.  Gene Slade was Chief.

### A.     GBI Interview

During 1993, the Georgia Bureau of Investigation ("GBI") investigated the suspected theft of money from the evidence room.  The GBI interviewed Stanley with Chief Slade, Captain Bagley, and Lieutenant Black present.  The record contains no transcript or GBI report regarding exactly what Stanley said to the GBI.  In his 1998 deposition, Stanley testified that he gave the GBI his "theory" that he suspected Chadwick of the theft because Chadwick was one of two people with keys to the evidence room and the theft appeared to be an "inside job":

> All it was was theory [sic], that's what we were talking about discussing suspects and theory. . . . There was only two people that had keys [to the evidence room]. [Chadwick] was one of them and Cooper was the other one, he and Cooper that knew the combination.

2

The evidence from the case itself suggested it was inside, it was people with knowledge of where the monies were kept, how they were kept, what was actually there. So at the time there was a lot of political talk going on that Slade wasn't going to be reappointed, and I dealt with some people in the past in the political end of it who talked about the way the City government would appoint their chiefs and some of the things that were done in the past. So these facts and circumstances led me to that conclusion. And this was only a theory, that was something for them to check.

Stanley knew Chadwick wanted to become Chief and speculated that Chadwick may have staged the theft to damage Chief Slade's credibility. Stanley testified that he informed only those people in the GBI interview.

The GBI interviewed Chadwick, who took a polygraph test. Chadwick testified that he learned of Stanley's comments to the GBI. Chadwick confronted Stanley about his comments, told Stanley that he did not appreciate them, and asked him if he had any evidence to support his suspicions. Ultimately, the GBI never identified anyone as responsible for the theft.

**B.     Retaliatory Employment Actions**

In late 1993, Chadwick became the Acting Chief of Police. Soon after becoming Chief in early 1994, Chadwick announced his intention to transfer Stanley from the Narcotics Unit to the third shift in the Uniform Patrol Division. The previous Chief preferred that persons serve in the Narcotics Unit for no longer than six years, and at the time of his transfer, Stanley had been in the Narcotics

Unit for six years. Chadwick asked other officers being transferred about their preferences of duty, but not Stanley.

When notified of the transfer, Stanley told Chadwick that he wished to remain in the Criminal Investigation Division to complete several gambling and narcotics investigations. Chadwick still transferred Stanley, but the transfer did not involve any loss of rank or decrease in salary. Stanley did lose his $600 uniform allowance and the use of a department automobile. According to Stanley, the transfer also prevented him from concluding his ongoing gambling and narcotics investigations and required him to work excessively long hours.

After his transfer, Stanley continued his gambling and narcotics investigations. Because Stanley's work schedule interfered with those investigations, Chadwick told Stanley that he would allow Stanley to "take some time off" if necessary to work on those cases. Despite this allowance, Chadwick frequently asked Stanley's supervisor, Captain Walthour, to check on Stanley and confirm that Stanley was actually at work.

Stanley also contends that he was passed over for promotion at least once after his statements to the GBI. According to Stanley, Chadwick failed to follow department procedure requiring the posting of notices for available positions. Rather than posting the availability of a Captain's position, Chadwick posted an

4

opening for a Lieutenant's position, promoted a Sergeant to that position, and then immediately promoted the Sergeant to the Captain's position.

## C. "Buy Fund" Investigation

In April 1994, Chadwick began an investigation of the "buy fund" in the Narcotics Unit which Stanley supervised prior to his transfer. The fund's accounting records contained inconsistencies, but there was no evidence money was missing. Stanley passed a polygraph test.

After the internal investigation, the City Auditor's audit revealed that department members had not completed the proper paperwork when receiving money from the "buy fund." Chadwick issued a written reprimand to Stanley in August 1994, for violating departmental policy by failing to ensure that the officers under his command properly completed the paperwork to utilize the "buy fund." Stanley maintains that the reprimand was undeserved and asserts that his officers properly completed the paperwork. The reprimand does state that Stanley received "very little guidance as to what was expected from [him]." Chadwick met with Stanley to inform him of the reprimand, and, as Stanley left this meeting, Chadwick asked: "How does it feel to be put under the microscope of suspicion?"

## D. Cooper Incident

In May 1997, Stanley had an altercation with Lieutenant Cooper. Stanley wanted to copy a large stack of papers and asked Lieutenant Cooper to instruct his staff to assist. Cooper refused even though his staff was not busy. Stanley responded by saying "damn it, I'll do it myself." Stanley proceeded to the copy room and began to make copies. Cooper followed Stanley and told Stanley that he would take care of it. Stanley asked Cooper to leave him alone, but Cooper insisted on helping and pulled the stack of papers away, causing them to fall.

Stanley and Cooper began to argue and Stanley repeatedly asked Cooper to leave the room, but he refused. When Stanley tried to leave the room, Cooper stood in the doorway, blocking the exit. Stanley placed his hands on Cooper to try to move him out of the way, causing Cooper to stumble. As described by Stanley, "I was going to march him through the door but when I went to spin him he jerked out backwards and he nearly fell." Cooper then left the copy room. When Captain Neal asked what was going on, Cooper reported that Stanley had struck him. Stanley began "cuss[ing] [Cooper] out" because Cooper had falsely accused him of striking Cooper.

After the altercation, Chadwick placed Stanley on administrative leave pending investigation. Captain Walthour investigated, and his written summary concluded that misconduct had occurred because Stanley used profanity and placed

6

his hands on Cooper.  Walthour also found that Cooper shared responsibility for the incident.  Walthour concluded that "[w]e can not tolerate this type of interaction between employees.  I recommend a ten day suspension without pay and advanced training in interpersonal relations as well as conflict management."

After a pre-disciplinary conference with Stanley, Chadwick issued a written reprimand of Stanley for conduct unbecoming an officer and simple battery, ordered Stanley to serve a six-day suspension, and required Stanley to undergo a "fitness for duty" examination by a psychologist.[1]  Chadwick's written reprimand stated that "I will not tolerate in the future your display of temper in this manner in any form.  Any further conduct along this line will result in further disciplinary action up to and including termination."  No disciplinary action was taken against Cooper.

## E.     Coker Incident and Stanley's Termination

In November 1997, Stanley discussed a shift change with a subordinate, Sergeant Coker.  Coker told Captain Walthour that Stanley lost his temper and used profanity, but Stanley denies this.  Walthour relayed Coker's complaint to Chadwick and interviewed both Coker and Stanley.  Because they reported

---

[1]After the examination, the psychologist concluded that Stanley was psychologically fit to perform his duties.

differing versions of the incident, Walthour's report concluded that no evidence existed to support misconduct charges against Stanley. Chadwick requested polygraph tests. Coker's results indicated truthfulness, but Stanley's indicated deception, as follows:

> The below-indicated pertinent questions were among those asked during the over-all examination.
> 5. HAVE YOU LIED REGARDING THIS INCIDENT WITH YOUR SERGEANT?
> 7. REGARDING THIS INCIDENT WITH YOUR SERGEANT HAVE YOU LIED ABOUT ANY PART OF IT?
> A total of three polygraph charts were recorded. An assessment of the psychophysiological responses of the examinee to the above questions reflected significant reactions which would [sic] considered to be indicative of deceptive criteria.
> It is polygraphist's opinion that physiological responses which are usually indicative of deception was [sic] noted. DECEPTION INDICATED.

Chadwick charged Stanley with "unprofessional conduct in the presence of a subordinate with the use of profanity, failure to control his temper, and providing false statements in an internal investigation."[2] After a pre-disciplinary conference,[3]

---

[2]Chadwick recalls charging only one other officer with unprofessional conduct for losing his temper. That incident was between an officer and a public citizen.

[3]Stanley asserts that the examiner testified at this conference that the polygraph results could indicate Stanley's "inability to clearly remember the incident in question." But what the polygraph examiner said was that Stanley had "some doubt about what happened, I think you are not completely sure" and then later in the testimony that deception "was indicated."

Chadwick terminated Stanley based on the Coker and Cooper incidents, the "buy

fund" investigation, and Stanley's polygraph results indicating deception.[4]

Stanley appealed his termination to the City of Dalton Public Safety

Commission. After a hearing, that Commission found that "the charges of conduct

unbecoming an officer arising out of the November 13, 1997 incident are true and

that [Stanley] . . . be herewith discharged from employment with the Dalton Police

Department effective December 22, 1997." In April 1998, Stanley filed this §

1983 action for violation of his first amendment rights alleging that Chadwick

terminated him for naming Chadwick as a suspect in the 1997 GBI's interview.

The only issue on appeal is whether the district court erred in denying Chadwick

qualified immunity on Stanley's first amendment claim.[5]

## II. QUALIFIED IMMUNITY

Pursuant to the qualified immunity doctrine, "government officials

performing discretionary functions generally are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

---

[4]Chadwick also points to an incident in 1984 in which Barbara Goforth alleged that Stanley called her a slut, and told her he was "going to knock [her] god damned head off." Stanley denies threatening Ms. Goforth, and states that he immediately apologized to her when told that he had hurt her feelings. Stanley avers that the first time he realized that he received a reprimand for that incident was when he received a reprimand for the Cooper incident.

[5]We review the district court's denial of qualified immunity de novo. Belcher v. City of Foley, 30 F.3d 1390, 1395 (11th Cir. 1994). Stanley brought other claims not relevant to this appeal.

constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is undisputed that Chadwick acted within his discretionary authority in terminating Stanley. Thus, we examine whether Stanley demonstrated that Chadwick violated clearly established law. See Gonzalez v. Lee County Hous. Auth., 161 F.3d 1290, 1295 (11th Cir. 1998); Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1281 (11th Cir. 1998).

For the law to be clearly established, the law "must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." Lassiter v. Alabama A&M Univ. Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Supreme Court has held that a "necessary concomitant" to the question of whether a plaintiff has alleged a violation of a clearly established federal right is "the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley. 500 U.S. 226, 232 (1991); GJR Invs., Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998); Cottrell v. Caldwell, 85 F.3d 1480, 1485 (11th Cir. 1996).

In evaluating qualified immunity, courts "'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so,

10

proceed to determine whether that right was clearly established at the time of the alleged violation.'" Wilson v. Layne, __ U.S. __, __, 119 S. Ct. 1692, 1697 (1999) (quoting Conn v. Gabbert, __ U.S. __, __, 119 S. Ct. 1292, 1295 (1999)).[6] "If a plaintiff has not sufficiently alleged a violation of any constitutional right, it is axiomatic that the plaintiff likewise has failed to allege the violation of a 'clearly established' right." GJR Invs., Inc., 132 F.3d at 1367.[7]

## III. JURISDICTION

Chadwick challenges the district court's rulings both on the sufficiency of evidence to prove the underlying constitutional violation and on the clearly established law issue.[8] Stanley challenges our jurisdiction over Chadwick's "evidence sufficiency" issues, and thus we discuss it. A public official may file an

---

[6]See Hartley v. Parnell, 193 F.3d 1263, 1268 (11th Cir. 1999) (recognizing the necessity of this order of proof); McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999) (same); Crosby v. Paulk, 187 F.3d 1339, 1345 (11th Cir. 1999) (same).

[7]See also Marshall v. Allen, 984 F.2d 787, 793 (7th Cir. 1993) ("Courts are not required to examine the clearly established law at the time of the offense if the plaintiff's allegations do not assert a violation of constitutional rights." (citing Siegert, 500 U.S. at 232)).

[8]On the "evidence sufficiency" front, Chadwick primarily argues (1) that Stanley presented no evidence that his 1997 termination was based in substantial part on his 1993 statements and (2) that, in any event, Chadwick has shown that he would have terminated Stanley absent the statements. Chadwick also argues that Stanley has not alleged, and his evidence does not show, any protected speech as a matter of law. On the clearly established law front, Chadwick argues that Stanley failed to cite any law with materially similar facts that would have notified Chadwick that his conduct violated clearly established law. Chadwick also challenges the district court's failure to apply the appropriate objective legal reasonableness standard in determining whether Chadwick's conduct violated clearly established law.

11

interlocutory appeal of the denial of qualified immunity where the disputed issue is whether the official's conduct violated clearly established law.  See Mitchell v. Forsyth, 472 U.S. 511, 527 (1985).  In Johnson v. Jones, 515 U.S. 304 (1995), the Supreme Court held that, where the only issue on appeal is a question of "evidence sufficiency" as to the constitutional right, the denial of qualified immunity is not immediately appealable.  Id. at 313.[9]  This court has explained the proper jurisdictional analysis when, as here, an interlocutory appeal presents both "evidence sufficiency" and clearly established law issues.  See Vista Community Serv. v. Dean, 107 F.3d 840, 843-44 (11th Cir. 1997); McMillian v. Johnson, 88 F.3d 1554, 1562-63 (11th Cir. 1996); Johnson v. Clifton, 74 F.3d 1087, 1091 (11th Cir. 1996).

---

[9]As we explained in Johnson v. Clifton, 74 F.3d 1087, 1090-91 (11th Cir. 1996), the issue in Johnson v. Jones was:

> whether there was any evidence in the record to support the District Court's ruling that a reasonable fact finder could find that the public officials were involved in the plaintiff's beating.  The defendants admitted that such a beating was unconstitutional and violated clearly established law; they only argued that the District Court had erred when it found a genuine issue of material fact in regard to their involvement in the unconstitutional conduct.  The Supreme Court held that such a ruling by the District Court could not be appealed as a final, collateral order.  It seems clear to us that the Supreme Court was not changing the well-established law of qualified immunity in the context of summary judgment, just elaborating on it.

Id. at 1090-91.

12

As stated in McMillian, "this circuit has not construed Johnson to bar immediate appellate review of fact-based rulings in all circumstances, and the Supreme Court's subsequent decision in Behrens v. Pelletier, 516 U.S. 299 (1996), confirms that Johnson did not work such a constriction of interlocutory appellate jurisdiction over orders denying a qualified immunity defense." McMillian, 88 F.3d at 1563. We have outlined how to draw the line between cognizable issues on appeal and those over which we lack jurisdiction. See Johnson v. Clifton, 74 F.3d at 1091.

Qualified immunity analysis has two components: "First, what was the official's conduct, based on the pleadings, depositions, and affidavits, when viewed in the light most favorable to the non-moving party? Second, could a reasonable public official have believed that such conduct was lawful based on clearly established law?" Id. Further, "[t]he resolution of the second issue constitutes a final, collateral order . . . [and] is immediately appealable. When such a ruling is appealable, the first issue–the factual issue–may be addressed by an appellate court because it is part of the core qualified immunity analysis. See Anderson v. Creighton, 483 U.S. 635, 641 (1987)." Id. If only the first issue is appealed, however, the appellate court has no jurisdiction to hear the case. Id.

13

In McMillian, we emphasized that "an appellate court may address the factual issue of what conduct the defendant engaged in because the issue is a necessary part of the core qualified immunity analysis of whether the defendant's conduct violated clearly established law." McMillian, 88 F.3d at 1563.[10] Therefore, "so long as the core qualified immunity issue is raised on appeal, a final, collateral order is being appealed, and the appellate court has jurisdiction to hear the case, including challenges to the district court's determination that genuine issues of fact exist as to what conduct the defendant engaged in." Id.

Further, when both the "evidence sufficiency" and clearly established issues are raised, we have two options of how to treat the factual issue. First, we may take the facts that the district court assumed when it denied qualified immunity as a given and address only the pure legal issues in the appeal. Or, we may conduct our

_____

[10]See Mencer v. Hammonds, 134 F.3d 1066, 1071 (11th Cir. 1998) (examining whether the plaintiff proved the requisite subjective intent in a case where subjective intent is an element of the underlying constitutional violation in an interlocutory qualified immunity appeal); Cottrell v. Caldwell, 85 F.3d 1480, 1491-92 (11th Cir. 1996) (in an interlocutory appeal of the district court's denial of summary judgment, turning first to plaintiff's evidence of the constitutional violation itself and holding, "plaintiff has failed to show a violation of due process, and it necessarily follows that the defendants are entitled to summary judgment on qualified immunity grounds"); Adams v. Poag, 61 F.3d 1537 (11th Cir. 1995) (in another interlocutory appeal of the district court's denial of summary judgment, holding defendants were entitled to summary judgment based on qualified immunity because plaintiffs failed to present evidence of deliberate indifference to support their eighth amendment claim); see also Johnson v. City of Fort Lauderdale, 126 F.3d 1372, 1379 (11th Cir. 1997); Walker v. Schwalbe, 112 F.3d 1127, 1132 (11th Cir. 1997); McMillian v. Johnson, 101 F.3d 1363, 1368 (11th Cir. 1996) (Propst, J., specially concurring); Foy v. Holston, 94 F.3d 1528, 1534-36 (11th Cir. 1996); Dolihite v. Maughon, 74 F.3d 1027, 1033 n.3 (11th Cir. 1996).

14

own analysis of the facts in the light most favorable to the plaintiff.  See Johnson v. Clifton, 74 F.3d at 1091.  We may choose to conduct our own factual analysis either because the district court did not adequately identify the facts or because "such a determination is part of the core qualified immunity analysis."  Id.  Also, as stated in Johnson v. Clifton, "even if such a determination were not part of the core qualified immunity analysis, it would be 'inextricably intertwined' with that analysis and within the appellate court's pendent jurisdiction.  Swint v. Chambers County Com'n, __ U.S. __, 115 S.Ct. 1203, 1209 (1995).  See also Johnson, __ U.S. at __, 115 S.Ct. at 2159."  Id.  Although we may independently review the record facts, we will not disturb a factual finding by the district court if there is any record evidence to support that finding.  See id.  We, like the district court, must consider the record evidence regarding the defendant's conduct in the light most favorable to the plaintiff.

In this appeal, because Chadwick raises both "evidence sufficiency" and clearly established law arguments, we have jurisdiction to review them.  Choosing the latter of our two options, we have made an independent review of the facts from the record.[11]

---

[11]Even when both "evidence sufficiency" and clearly established issues are raised, we may, but are not required to, review the "evidence sufficiency" issues.  In some cases, we have accepted the district court's facts as supported by the evidence and then exercised our discretion to decline to review the "evidence sufficiency" issues.  See Cooper v. Smith, 89 F.3d 761, 764 n.3 (11th Cir.

15

## IV. FIRST AMENDMENT VIOLATION

We now turn to whether Stanley showed a violation of his constitutional rights at all. A state employer can not retaliate against a state employee for engaging in speech constitutionally protected under the First Amendment. Rankin v. McPherson, 483 U.S. 378, 383 (1987); Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989).[12] The law recognizes, however, that the state has an interest as an employer in regulating the speech of its employees and attempts to balance the competing interests of the public employee and the state. See Rankin, 483 U.S. at 384; Pickering v. Board of Educ., 391 U.S. 563, 568 (1968).

To strike this balance, we utilize a four step inquiry in assessing first amendment retaliation claims. See Bryson, 888 F.2d at 1565. Where a public employee alleges wrongful termination because of the exercise of free speech, the

---

1996) ("The district court determined that Cooper had adduced sufficient evidence to create a jury question as to whether Cooper's speech in cooperating with the GBI caused Smith to terminate him. To the extent that Smith challenges that determination on appeal, we decline to address Smith's argument, which amounts to an evidentiary sufficiency issue not itself immediately appealable." (emphasis added) (citations omitted)). At first glance, Cooper's footnote may seem inconsistent with other decisions but it is not. An evidentiary sufficiency issue itself is not immediately appealable, but is appealable only if a core part of, or "inextricably intertwined with," the clearly established law issues. Further, when both types of issues are presented, as in Cooper, this court is not required to look at, and can decline to review, an evidentiary sufficiency issue because such evidentiary sufficiency issue is not itself appealable. However, in this case we not only have elected the second option of reviewing the record but also have exercised our discretion to address the evidentiary sufficiency issues. See Cottrell, 85 F.3d at 1490; Adams, 61 F.3d at 1542-43.

[12]A "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." Connick v. Myers, 461 U.S. 138, 140 (1983).

employee must show by a preponderance of the evidence that: (1) the employee's speech is on a matter of public concern; (2) the employee's first amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech in order to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee. If the employee succeeds in showing the preceding factors, the employer must prove by a preponderance of the evidence that (4) "it would have reached the same decision . . . even in the absence of the protected conduct.'" Id. at 1565-66 (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).

## A.   Public Concern

Stanley's speech is a theory, voiced to the GBI, that Chadwick might have stolen money from the evidence room. This speech relates to a matter of public concern.[13]  See Cooper v. Smith, 89 F.3d 761, 765 (11th Cir. 1996) (concluding

_____

[13]To involve a matter of public concern, a government employee's speech must "relat[e] to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. If the government employee speaks "not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Id. at 147.  Because "[a]n employee's speech will rarely be entirely private or entirely public," the "main thrust" of the employee's speech must be determined. Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993). This determination is made by examining "the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48; Morgan, 6 F.3d at 754. When there is a personal element to the speech, complaints of wrongdoing within a public agency may not

17

that a deputy's cooperation with a GBI investigation into corruption in the

Sheriff's Department constituted speech on a matter of public concern and stating

that "[t]here can be no doubt that corruption in a police department is an issue of

public concern"); Bryson, 888 F.2d at 1566 (concluding that a police officer's

complaint to the city manager that the Chief of Police stole whiskey from the

department evidence room was speech on a matter of public concern); see also

Fikes v. City of Daphne, 79 F.3d 1079, 1084 (11th Cir. 1996) (finding a police

officer's complaints to officials, including the Alabama Bureau of Investigation,

regarding police misconduct to be a matter of public concern).

Chadwick asserts that Stanley's speech is not protected because it was made

in the form of a speculative theory about the missing money rather than a statement

of concrete fact.  Although the theoretical form of Stanley's statements affects the

weight we give this speech in the Pickering balance, it does not defeat the public

concern nature of Stanley's speech.[14]

---

constitute speech on a matter of public concern.  See Maggio v. Sipple, 211 F.3d 1346, 1352 (11th Cir. 2000); Morgan, 6 F.3d at 754.  At this juncture, the record contains no evidence of a personal motivation by Stanley.

[14]See Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994) (stating that "the manner of a public employee's speech is an important element in the Pickering balance"); Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 n.2 & 1324 (11th Cir. 1989) (assuming that the plaintiff's statements to the press that the County Manager was a "paid lackey" were statements on a matter of public concern and stating that this assumption did not require it to "give the speech the same weight we would give to a simple statement of opinion" in performing the Pickering balance).

18

**B.** **Pickering Balance**

We next weigh "the employee's first amendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Bryson, 888 F.2d at 1565 (quoting Pickering, 391 U.S. at 568).[15] In striking this balance, we consider these factors: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time, and place of the speech, and (3) the context within which the speech was made. Id. at 1567 (punctuation and citations omitted).

We weigh Stanley's interest in voicing to the GBI his theory about Chadwick's stealing money against the admittedly strong interests of Chadwick and the police department in maintaining close working relationships, mutual respect, discipline, and trust in the quasi-military setting of the police department.[16]

---

[15]Chadwick appears to argue that we should weigh Stanley's interest in making the protected speech against the department's interest in firing Stanley (rather than the department's interest in prohibiting the speech). This argument is without merit as Chadwick confuses this, the second prong, with the third and fourth prongs of Bryson. See Vista Community Servs. v. Dean, 107 F.3d 840, 845 (11th Cir. 1997) (rejecting a similar argument).

[16]See Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994) (recognizing that "[o]rder and morale are critical to successful police work: a police department is 'a paramilitary organization with a need to secure . . . efficiency among the ranks due to its status as a quasi-military entity different from other public employers.'"(citations omitted)); Busby v. City of Orlando, 931 F.2d 764, 774 (11th Cir. 1991) (describing the unique need for maintaining loyalty, discipline, and good working relationships within a police department).

There is no bright-line standard, and <u>Pickering</u> requires a careful balancing of competing interests on a case-by-case basis. Sometimes, one aspect of the speech in issue can be determinative. Indeed, in weighing these factors, this court has reached divergent outcomes in similar police department cases because of the presence or lack of a particular factor. <u>Compare</u> <u>Cooper</u>, 89 F.3d at 765, and <u>Fikes</u>, 79 F.3d at 1084, <u>with</u> <u>Bryson</u>, 888 F.2d at 1567, and <u>Hansen</u>, 19 F.3d at 577-78.

For example, in <u>Cooper</u> a deputy sheriff's interest in cooperating with a GBI investigation into corruption at the sheriff's office outweighed the sheriff's interest in the efficient operation of the department. However, in <u>Bryson</u>, this Court concluded that the <u>Pickering</u> balance weighed in favor of the defendant police department. Bryson filed a complaint with the city manager that Chief Taylor "had stolen whiskey from the police department evidence room in 1980." <u>Bryson</u>, 888 F.2d at 1564. Similar to this case, that complaint was later determined to be unfounded. However, Bryson also made "bitter complaints" to all who would listen in the police department and became increasingly dissatisfied with the Chief's personnel decisions. As a result, Bryson's speech was afforded less weight. <u>Id</u>. at 1567; <u>see</u> <u>also</u> <u>Hansen</u>, 19 F.3d at 577 (finding that the <u>Pickering</u> balance did not inevitably favor the plaintiff officer where he provided deposition

20

testimony in the criminal prosecution of another police officer because his statements were made in a "vulgar, insulting, and defiant" manner).[17]

There is no evidence that Stanley's speech caused disruption in the Dalton Police Department or was stated in an inappropriate manner. However, Stanley's statements admittedly were merely a theory rather than concrete statements of fact about what Stanley had actually seen, heard, or knew about criminal activity in the police department. Chadwick was Deputy Chief, and the only basis for Stanley's theory was, in effect, Chadwick's management role over the evidence room and his possession, in that role, of a key to that room. Making an accusation as serious as theft against a Deputy Chief based on only his role as a manager undoubtedly could be considered disruptive and potentially undermining to the mutual respect and confidence needed for fellow officers in a police department.

The police department has a strong interest in preventing disruptive speech, such as unfounded accusations against superiors. This is especially true here where Stanley could easily have advised the GBI that Chadwick was in charge of the evidence room and had one of the two keys without going further and accusing

---

[17]See also Busby, 931 F.2d at 774 (finding that the balance would not inevitably weigh in favor of the plaintiff police officer because the defendants merely sought to delay access to a public forum until the police department's internal affairs division could investigate the complaints); Dartland, 866 F.2d at 1324 (stating that the "rude and insulting" nature of the speech gave the speech a personal rather than public aspect and thereby diminished the interest of the plaintiff in expressing the sentiments).

Chadwick of theft. At a minimum, Stanley has a diminished interest in offering a theft accusation which he, as a trained police officer, described as merely a theory. The fact that the GBI initiated the questioning of Stanley does not mean that everything Stanley said was protected speech. See Hansen, 19 F.3d at 576 (stating that "the act of providing testimony does not, by itself, absolutely shield the public employee from further scrutiny by his superiors"). If, for example, Stanley intentionally and knowingly falsely accused Chadwick of theft, the Pickering balance readily would favor the government's need for trustworthy police officers.[18]

On the other hand, because the theft looked to Stanley like "it was inside" and Chadwick was in charge of the evidence room, Stanley had some factual basis, albeit slight, for telling the GBI that he suspected Chadwick. Stanley also did not voice his suspicions to any co-workers outside the GBI interview room or the

_____

[18]At this juncture, Chadwick has not shown knowledge or reckless falsehood, but we agree that knowingly or recklessly false statements would not be entitled to first amendment protection. See Chappel v. Montgomery County Fire Protection Dist. No. 1, 131 F.3d 564, 576 (6th Cir. 1997) (stating "although protection may not be available when a public employee knowingly or recklessly makes false statements, it is the defendants' burden to establish that [the plaintiff] knew or was recklessly indifferent to the fact that his speech was false") (citations omitted); see also Dill v. City of Edmond, Okla., 155 F.3d 1193, 1202 (10th Cir. 1998) (stating that defendants must show that the plaintiff knew or should have known that the statements were false); Powell v. Gallentine, 992 F.2d 1088, 1091 (10th Cir. 1993) (stating that even false statements are protected as long as they were not knowingly or recklessly false).

public.[19]  In contrast to <u>Hansen</u>, Stanley's statements were responsive to the GBI's inquiry, and in contrast to <u>Bryson</u>, there is no evidence of disruption of the Dalton police department's operations.  We conclude that the <u>Pickering</u> balance tilts in Stanley's favor.

## C.    Substantial Factor in Termination

Under <u>Bryson</u>, we next determine whether Chadwick terminated Stanley in 1997 in substantial part because of Stanley's statements to the GBI in 1993.  The district court correctly concluded that Stanley's evidence created a jury question regarding whether his protected speech was a substantial factor in Chadwick's employment decision.  We have stated that plaintiff's burden in this regard is not a heavy one.  See <u>Walker v. Schwalbe</u>, 112 F.3d 1127, 1131 (11th Cir. 1997); <u>Beckwith v. City of Daytona Beach Shores</u>, 58 F.3d 1554, 1564 (11th Cir. 1995).  Further, "[i]t is neither possible nor desirable to fashion a single standard for determining when an employee has met her initial burden of demonstrating that a retaliatory intent was a 'substantial' or 'motivating factor' behind a government employment decision."  <u>Beckwith</u>, 58 F.3d at 1564.  Rather, we examine the record as a whole to ascertain whether Stanley presented sufficient evidence for a

[19]If Stanley did in fact voice his suspicions to co-workers, such as Walthour, outside of the context of the GBI interview, a different outcome might ensue.  Given the summary judgment posture of this case, however, we must assume the accuracy of Stanley's testimony that he did not do so.

23

reasonable jury to conclude that his protected speech was a "substantial"

motivating factor in the decision to terminate him.  Id.[20]

In this case, Stanley is not able to show any inference of causation from

temporal proximity.  Indeed, there was an almost four year gap between his

protected speech and his termination, which arguably defeats causation.

Nonetheless, we have stated that "gaps of time, standing alone, do not preclude [a

plaintiff] from producing enough evidence for a reasonable jury to conclude that

protected speech was a substantial factor in the decision to terminate him."

Beckwith, 58 F.3d at 1567 (fourteen-month lapse in time); Schneider v. Indian

---

[20]In conducting this examination in the past, we considered several factors as relevant.  We concluded that "[w]here termination closely follows protected activity, it is usually reasonable to infer that the activity was the cause of the adverse employment decision."  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 745 (11th Cir. 1996).  We also examined whether any other asserted reasons for the termination were shown to be pretextual.  See Walker, 112 F.3d at 1131 (noting a question of fact as to whether the policy under which the employee was allegedly fired was in effect at the time of the conduct in question); Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1507 (11th Cir. 1990) (noting evidence calling the asserted reason for the discharge into question).  Further, we examined any comments made, or actions taken, by the employer indicating that the discharge was related to the protected speech.  See Fikes, 79 F.3d at 1084 (noting the police chief's statement that he wanted the plaintiff out of the department); Stewart, 908 F.2d at 1507 (noting comments indicating the speech was a factor in the termination decision); Morro v. City of Birmingham, 117 F.3d 508, 516 (11th Cir. 1997); Beckwith, 58 F.3d at 1565; Schneider v. Indian River Community College Found., Inc., 875 F.2d 1537, 1543 (11th Cir. 1989).  We also looked to whether the asserted reason for the discharge varied.  See Fikes, 79 F.3d at 1084 (noting that the initial cause cited for discharge was different than the cause stated at an internal hearing).  Finally, we considered circumstantial evidence of causation including such facts as who initiated any internal investigations or termination proceedings, whether there was any evidence of management hostility to the speech in question, or whether the employer had a motive to retaliate.  See Beckwith, 58 F.3d at 1564-65.  There is no one factor that is outcome determinative, but all factors must be taken into account.

24

River Comm. College Found., Inc., 875 F.2d 1537, 1543 n.9 (11th Cir. 1989) (ten-month lapse in time).  Although the gaps of time in these cases were significantly shorter than the four year gap here, Stanley is not precluded from producing other evidence to establish causation.

Stanley's evidence shows that Chadwick confronted Stanley about his statements to the GBI and challenged the basis for Stanley's suspicions.  When Chadwick became Chief, he transferred Stanley without asking his preference of assignments as he did others.  Chadwick also failed to follow departmental policy in advertising an available promotion and promoted another employee even though Stanley was eligible for consideration for the promotion.  In 1994, Chadwick ordered an investigation of the "buy fund" and reprimanded Stanley even after he passed a polygraph test.  Tellingly, Chadwick also asked Stanley how it felt "to be put under the microscope of suspicion."  In 1997, Chadwick reprimanded only Stanley and not Cooper even though the internal investigation faulted both of them.  Chadwick then discharged Stanley after the Coker incident.  Although a close call, we conclude that Stanley presented sufficient evidence to create a jury question on causation.

**D.    "But For" Test**

The district court summarily stated that "a finding in Plaintiff's favor on the third part of the Bryson test compels a finding in favor of Plaintiff on the fourth part as well." This was error because a defendant may still obtain summary judgment on the affirmative defense set out in Bryson's fourth step, even if a plaintiff presents a factual issue on the third prong. Chadwick may still prevail by showing that there is no question of fact as to whether he would have taken the same action in the absence of the speech. See Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1086 (11th Cir. 1996) (granting summary judgment for the defendant on a first amendment retaliation claim, despite the assumption that the plaintiff could show that his speech was a substantial factor in his failure to be promoted, because the defendant showed that the same decision would be made even absent the protected speech); Marshall v. City of Cape Coral, 797 F.2d 1555,

1561 (11th Cir. 1986) (same).[21]  Rather than remanding this issue, we address it in light of our independent review of the record on other issues.

Bryson's fourth step involves an affirmative defense that is derived directly from the Supreme Court's decision in Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274 (1977).  Plaintiff Doyle claimed that he had been discharged as a public school teacher for exercising his free-speech rights under the First Amendment.  Because the Court did not wish to place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing, id. at 285, the Court concluded that such an employee  ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record.  Id. at 286.  As a result, the Court in Mt. Healthy held that once the plaintiff shows that his constitutionally protected speech was a

---

[21]We recognize that in Beckwith this court stated that "if Appellant produced enough evidence for a reasonable jury to conclude that a retaliatory animus substantially motivated his termination, Appellees could only rebut this showing by convincing the jury, not the court, that a legitimate reason justified the decision.  Beckwith, 58 F.3d at 1564; see also Morro v. City of Birmingham, 117 F.3d 508, 516 (11th Cir. 1997).  However, Beckwith was an appeal from a final judgment on the merits in favor of the defendant and no qualified immunity issues were raised in that case.  Beckwith focused on the third prong about whether the plaintiff had shown his protected speech was a substantial factor in the employer's decision to terminate him and did not examine the evidence regarding, or discuss, the fourth prong.  In contrast, those cases involving a qualified immunity defense all appear to conduct an inquiry of the fourth prong on the merits prior to reaching the qualified immunity question.  See, e.g., Vista, 107 F.3d at 845-46; Walker, 112 F.3d at 1132.  Thus, this is what we do here.

27

"substantial" or "motivating factor" in his or adverse treatment by the employer, the employer should be given an opportunity to show "by a preponderance of the evidence that it would have reached the same decision as to [the plaintiff] even in the absence of the protected conduct." Id. at 287.

To fulfill this burden, a government employer must show that the legitimate reason would have motivated it to make the same employment decision. See Holley v. Seminole County Sch. Dist., 755 F.2d 1492, 1505 (11th Cir. 1985) (stating that the issue under Mt. Healthy "is not whether the Board had objective reason not to renew Holley–it apparently did–but, rather, what in fact motivated the Board in light of Holley's political activity."). An employer must show "by a preponderance of the evidence, that, in light of [its] knowledge, perceptions, and policies at the time of the termination, [it] would have terminated [the employment] regardless of [the protected] speech." Board of County Comm'rs, Wabaunsee Cty., Kansas v. Umbehr, 518 U.S. 668, 685 (1996).

In cases where we affirmed summary judgment for the employer under this fourth prong, we found no liability despite the employer's partial reliance upon protected speech in taking an adverse employment action. In each case, we focused on the particular evidence in the summary judgment record. For example, in Harris v. Shelby County Board of Education, 99 F.3d 1078 (11th Cir. 1996), the

plaintiff, an assistant high school principal, alleged that he was not selected as principal due to his comments to a newspaper regarding racial and criminal tensions at the school. There was strong evidence that speech was a substantial factor in the decision because the main decisionmaker stated that she was "mad as hell" about the newspaper article, she intended to ask the plaintiff about it, and that the plaintiff was "too controversial" for the position. Id. at 1081. We concluded, however, that even if the plaintiff succeeded on Bryson's first three prongs, the defendant presented sufficient evidence that the same decision would have been made absent the protected speech to warrant summary judgment. Specifically, the successful candidate had nine years' experience as a principal, while the plaintiff had none, and was certified for school administration while the plaintiff was not. The successful candidate had been named the Outstanding Secondary School Principal in Alabama and President of the Alabama Association of Secondary School Principals. Also, the plaintiff himself expressed uncertainty as to whether he was ready to assume a high school principalship. Id. at 1085-86.

Similarly, in Marshall v. City of Cape Coral, 797 F.2d 1555 (11th Cir. 1986), the plaintiff was Superintendent of the Water Production Division of the Cape Coral Utilities Department and oversaw two water plants where water quality standards were not observed. The plaintiff's supervisor discharged him for

29

insubordination and failing to perform certain duties relating to the violations of water quality standards. The plaintiff alleged that the true reason for his discharge was his memorandum criticizing his supervisor, which he sent to the City Manager directly (instead of through proper channels). This court found that, even assuming the memorandum was protected speech and the insubordination charge was improper, it was not disputed that water quality standards were violated and plaintiff failed to report the violations. The City Manager affirmed the plaintiff's discharge based solely on deficient performance, and felt he had no choice but to fire the plaintiff given the admitted violation of water standards. As a result, we stated that "[w]e cannot say that summary judgment is never appropriate for these employee speech claims where the defendant so clearly had compelling independent reasons for not continuing employment." Id. at 1561 (quoting Montgomery v. Boshears, 698 F.2d 739, 743 (5th Cir. 1983)).

This same fact intensive approach has been followed in retaliation cases in the employment setting where we affirmed the denial of summary judgment.[22] Thus, in evaluating summary judgment involving Bryson's fourth step, we have engaged in a case-by-case approach based upon the particular facts of each case in

_____

[22]See Holley, 755 F.2d at 1505; Clemons v. Dougherty Cty., Ga., 684 F.2d 1365, 1370-71 (11th Cir. 1982); Avery v. Homewood City Bd. of Educ., 674 F.2d 337, 341 (5th Cir. Unit B 1982).

30

order to determine whether the defendant would have fired the plaintiff absent the protected speech.

Chadwick attempts to prevail by proffering evidence of the polygraph results indicating deception, the Coker and Cooper incidents, and Stanley's history of similar outbursts. Stanley, however, still disputes the Coker incident and parts of the Cooper altercation. There is deception in Stanley's polygraph results. Lies by a police officer can alone be sufficient to support termination and can carry the day under the fourth prong in certain circumstances. However, here, Stanley's deception concerned whether he used profanity and lost his temper with Coker, rather than any form of criminal activity or sexual harassment of other employees. Thus, while Chadwick has presented sufficient evidence to create a jury issue on the fourth step's affirmative defense, his evidence is not strong enough to warrant judgment as a matter of law. While the deception alone was an adequate lawful basis to terminate Stanley, we cannot say as a matter of law that Chadwick necessarily would have done so absent Stanley's having accused him of theft.

## V. CLEARLY ESTABLISHED LAW

Having created jury issues on the existence of his constitutional claim, Stanley still must demonstrate that a reasonable police chief would know that terminating a subordinate officer in these factual circumstances violated clearly

established law.  Harlow v. Fitzgerald, 457 U.S. 800 (1982).  We examine the precise conduct by Chadwick and Stanley—such as, the precise information Stanley had before his GBI interview and Chadwick possessed about Stanley's misconduct before terminating him—in order to determine whether a reasonable police chief would have known that terminating Stanley violated clearly established law.[23]  The question is not whether a reasonable police chief would know the general principle that it violates the law to terminate a public employee in retaliation for protected speech.  Instead, here, as in all qualified immunity cases, the issue is fact specific:  in 1997, would a reasonable police chief have known that terminating a subordinate officer in this particular factual context violated clearly established law.

This objective formulation shields Chadwick from suit, even though he in fact committed constitutional violations, provided that a police chief reasonably, albeit mistakenly, could have believed that his conduct was lawful.  In other words, a police chief can guess wrong about the constitutionality of his conduct, provided the mistake is a reasonable one.  The Supreme Court has stated that "the Harlow [objective reasonableness] standard . . . gives ample room for mistaken

[23]See the discussion of this approach in Dolihite v. Maughon, 74 F.3d 1027, 1034 n.3 (11th Cir. 1996).

judgments." Malley v. Briggs, 475 U.S. 335, 343 (1986).[24] Harlow does this

because "[r]eliance on the objective reasonableness of an official's conduct, as

measured by reference to clearly established law, should avoid excessive

disruption of government and permit the resolution of many insubstantial claims on

summary judgment." Harlow, 457 U.S. at 818.

At this stage of our inquiry, Chadwick asserts two different theories of

qualified immunity. First, Chadwick argues that, because Chadwick was

motivated, at least in part, by legitimate considerations, Chadwick – even if he also

acted, in part, upon unlawful motives – acted in an objectively reasonable manner.

Second, Chadwick argues that, because the Pickering balance in this case was not

inevitable, it was not clearly established in this Circuit in 1997 that Stanley's

speech was entitled to first amendment protection. We now address Chadwick's

arguments in turn.

## A. Clearly Established Law and Mixed Motives

Chadwick contends that the record – even when viewed in the light most

favorable to Stanley – demonstrates, at worst, a mixed-motives case. Chadwick

says that the record indisputably establishes that Chadwick was motivated, at least

---

[24]Our prior decisions discuss in depth the policy reasons why the qualified immunity defense allows for reasonably mistaken beliefs. See, e.g., Foy v. Holston, 94 F.3d 1528, 1532-34 (11th Cir. 1996); Lassiter v. Alabama A & M Univ. Bd. of Trustees, 28 F.3d 1146, 1149-50 (11th Cir. 1994) (en banc).

33

in part, by lawful considerations. And, Chadwick – citing our decision in Foy v.

Holston, 94 F.3d 1528 (11th Cir. 1996) – argues that, in the light of these lawful

motives, a reasonable police chief in Chadwick's circumstances (having both

lawful and unlawful motives) would not have known that terminating Stanley's

employment violated clearly established law. Accordingly, Chadwick says that he

is entitled to qualified immunity.

In Foy, we noted that the presence of a jury issue about a defendant's

improper intent does not necessarily preclude qualified immunity.[25] Foy, 94 F.3d

at 1533. We explained that "[w]here the facts assumed for summary judgment

purposes in a case involving qualified immunity show mixed motives (lawful and

unlawful motivations) and pre-existing law does not dictate that the merits of the

case must be decided in plaintiff's favor, the defendant is entitled to immunity."

Id. at 1535. The decision in Foy is the law of this Circuit and sets out the proper

analysis to apply in potential mixed-motive cases.[26] See Johnson v. City of Fort

---

[25]Qualified immunity is not ruled out "wherever discriminatory intent appears in the summary judgment record even if discriminatory intent is an element of the underlying constitutional tort." Foy, 94 F.3d at 1533. Indeed, "[t]he Supreme Court has not instructed us to drop qualified immunity (with its test of objective reasonableness) from cases in which discriminatory intent is an element of the underlying tort." Id. at 1533-34. "At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage." Id. at 1534-35.

[26] Since we decided Foy, the Supreme Court has decided Crawford-El v. Britton, 118 S. Ct. 1584 (1998). The parties disagree about the effect of Crawford-El upon Foy and its progeny. We, therefore, have re-examined Foy in the light of Crawford-El. We conclude that Foy remains the law

34

Lauderdale, 126 F.3d 1372, 1379 (11th Cir. 1997) (applying Foy and granting qualified immunity at summary judgment in a first amendment retaliation case indicating mixed motives). We, therefore, apply the Foy analysis in this case.

We conclude that Chadwick is due qualified immunity under Foy. A defendant is entitled to qualified immunity under the Foy rationale only where, among other things, the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations. See Foy, 94 F.3d at 1535 ("[t]he record makes it clear that Defendants' acts were actually motivated by lawful considerations without which they would not have acted."); see also

_____

of this Circuit.

 In Crawford-El, the Supreme Court rejected a rule – adopted by the D.C. Circuit – imposing a heightened burden of proof on plaintiffs in unconstitutional-motive cases. See 118 S. Ct. at 1588-90 (discussing rule adopted by lower court). The Court – concluding that a heightened burden of proof is unnecessary to preserve the qualified immunity defense in unconstitutional-motive cases – noted that the settled rules of summary judgment and qualified immunity facilitate the disposition of even unconstitutional-motive cases at the summary judgment stage. Id. at 1594. The Court, however, did not discuss how exactly courts should apply the objective reasonableness test after a plaintiff has created a jury question on improper motive where improper motive is an element of the plaintiff's claim. See id. at 1599 (Rehnquist, C.J., dissenting) (noting that Court did not "discuss this question at all"); see also Eskow and Cole, The Unqualified Paradoxes of Qualified Immunity: Reasonably Mistaken Beliefs, Reasonably Unreasonable Conduct, and the Specter of Subjective Intent That Haunts Objective Legal Reasonableness, 50 Baylor L. Rev. 869, 895 (1998) ("Crawford-El did not, however, address what the district court should do once the plaintiff submits his or her evidence of intent to the court and a defendant raises a qualified immunity defense."). In this regard, Crawford-El did not separately propose its own analysis for unconstitutional-motive cases, much less reject the kind of analysis we used in Foy. And, because Foy is based on well-settled principles of summary judgment and qualified immunity, we think that the approach taken in Foy is consistent with the Supreme Court's words and holding in Crawford-El. We, therefore, conclude that Foy remains the law of this Circuit. See United States v. Smith, 201 F.3d 1317, 1322 (11th Cir. 2000) (explaining that this Court is bound by earlier panel holding "unless and until that holding is overruled en banc, or by the Supreme Court").

35

Johnson, 126 F.3d at 1379 (noting that Foy "rested primarily on the existence of an indisputable and adequate lawful motive"). In this case – viewing the record in the light most favorable to Stanley, as we must at the summary judgment stage – we can say that the record undisputably establishes (a) that objectively valid reasons did exist for the step Chadwick took, and (b) that Chadwick was motivated, at least in part, by these lawful considerations. Thus, even at the summary judgment stage, we can say that this case is undisputably one of mixed motives. Therefore, Foy commands qualified immunity on mixed-motive grounds in this case.[27]

First, an undisputed and adequate lawful basis existed for Stanley's termination. While Stanley denies certain parts of the Coker and Cooper incidents, Stanley admitted that he used profanity and placed his hands on Cooper and that Walthour's internal investigation faulted him, along with Cooper. Chadwick then wrote Stanley that he would not tolerate further displays of temper and that further conduct along this line could result in discipline, including termination. Subsequently, Coker complained about Stanley's loss of temper and profanity.

---

[27]Foy's approach is particularly appropriate in this first amendment case because Foy drew, in part, on the Supreme Court's decision in Mt. Healthy City Board of Education v. Doyle, which is directly applicable to Stanley's constitutional claim. Even if a plaintiff proves a retaliatory motive and causation, a defendant employer can still win under Mt. Healthy (Bryson's fourth step) if the employer shows that it would have made the same decision absent the protected speech. Even if improper retaliatory motive and causation are proven, a defendant employer still has an affirmative defense to liability under Bryson/Mt. Healthy and an affirmative defense to suit under qualified immunity.

36

While Stanley denied Coker's allegations, the undisputed evidence shows that Stanley's polygraph results indicated deception in his statements during the Coker internal investigation. Thus, an adequate lawful basis existed for the termination of Stanley.[28] Foy, 94 F.3d at 1535. Furthermore, Stanley has not shown that it would have been unlawful to terminate him for his conduct with Cooper and deception in the Coker matter absent his speech. No jury could find that it would have been unlawful to terminate Stanley as Chadwick did absent retaliatory motive. See Foy, 94 F.3d at 1535.

Secondly, the record also establishes without dispute that Chadwick was motivated, at least in part, by Stanley's deception and incidents with Cooper and Coker.[29] Chadwick consistently—in a meeting with Stanley, in a letter to Stanley, in his deposition, and in an affidavit—identified Stanley's deception and the incidents with Cooper and Coker as motives for Chadwick's decision to terminate

[28]In the Dalton City Handbook, both "[t]he willful making of false statements to supervisors, officials, the public, boards, commissions, or agencies" and "[e]ngaging in offensive conduct or using offensive language toward the public, supervisory personnel, or fellow employees" are listed as actions subject to discipline up to, and including, dismissal. Further, the Dalton Police Department Rules of Conduct lists both lying in a departmental investigation and profane language as Conduct Unbecoming an Officer for which the maximum penalty is dismissal.

[29]We emphasize that it is not sufficient for Chadwick to establish that there exists a lawful basis for a reasonable police chief to have terminated Stanley. Rather, in order for the Foy analysis to apply, Chadwick himself must have been actually motivated, at least in part, by that lawful basis. See Johnson, 126 F.3d at 1379 (noting that Foy "rested primarily on the existence of an indisputable and adequate lawful motive on the part of the social service employees"); Foy, 94 F.3d at 1535 ("[t]he record makes it clear that Defendants' acts were actually motivated by lawful considerations without which they would not have acted.").

Stanley. Captain Walthour recommended to Chadwick that Stanley be terminated because of his deception and losing his temper with Cooper and Coker. And, very important, it is undisputed that Stanley's protected speech was in 1993 but that Chadwick did not terminate Stanley until <u>after</u> Stanley's incidents with Coker and Cooper in 1997. While we cannot say on the underlying constitutional claim—at this summary judgment stage—that it is undisputable that Stanley would have reached the same decision totally <u>absent</u> the protected speech, we can say that it is undisputable that, even given that speech, Chadwick would not have terminated Stanley in 1997 <u>absent</u> the 1997 incidents. Although the four year time gap does not preclude Stanley from showing that Chadwick acted in substantial part because of Stanley's protected speech, this time gap and the undisputed fact that Chadwick did not terminate Stanley until after Stanley's deception and after not one, but two, incidents with co-employees show undisputably that Stanley's 1997 conduct and deception prompted, at least in part, Chadwick's actions. It is also undisputed that after the first incident, Chadwick warned Stanley about the consequences of similar conduct in the future, and then terminated him only after the conduct reoccurred. Thus, the summary judgment record undisputably establishes that Chadwick was motivated, at least in part, by Stanley's misconduct and deception in 1997.

As explained above, Chadwick may prevail on the merits of this first amendment retaliation claim even if Stanley establishes that Chadwick acted in substantial part in retaliation for Stanley's protected speech. Specifically, Chadwick would prevail if he could show that he would have reached the same decision absent the protected speech. Although Chadwick has not succeeded on this affirmative defense at the summary judgment stage, the presence of the defense nonetheless must be taken into account in our analysis of the clearly established law. The result is that Chadwick is entitled to qualified immunity if, given the presence of an indisputable and lawful motive, a reasonable police chief would not have known that firing Stanley for both his protected speech and this lawful reason violated Stanley's constitutional rights.

Here, Stanley has not demonstrated that a reasonable police chief, faced with the same evidence of Stanley's conduct and acting at least in part with a lawful motive, would have known that terminating Stanley violated clearly established law. Even if a reasonable police chief acted with retaliatory motive, the law in 1997 did not clearly establish that a reasonable police chief—faced with the same undisputed evidence of Stanley's misconduct and undisputably acting at least in part because of Stanley's misconduct—should not have terminated Stanley in the same manner. See Johnson v. City of Fort Lauderdale, Fla., 126 F.3d 1372, 1379

(11th Cir. 1997). Stanley points us to no cases (and we have found none) which would have clearly established as a matter of law that a reasonable police chief cannot act lawfully under these circumstances—even when we accept that the circumstances do include a retaliatory motive on account of Stanley's protected speech. See Foy, 94 F.3d at 1536.

Because, given the circumstances and the state of the law, a reasonable police chief could have lawfully terminated Stanley for his misconduct and thus could have considered Chadwick's termination proper, even if motivated in substantial part by an unlawful motive, Chadwick's termination of Stanley was objectively reasonable for the purposes of qualified immunity. See Johnson, 126 F.3d at 1379; Foy, 94 F.3d at 1536. Thus, the district court erred in denying Chadwick qualified immunity.

## B. Clearly Established Law and the Pickering Balance

We find Chadwick's second argument – that the outcome of the Pickering balance in this case was not inevitable – equally compelling. We conclude that, in 1997, it was not clearly established in this circuit that the Pickering balance would inevitably weigh in Stanley's favor. Given the fact that Stanley's "theory" that Chadwick stole money was based mainly on Chadwick's being the manager over the evidence room and that this theory was never substantiated, we cannot say that

40

the Pickering balance would lead a reasonable police chief to "the inevitable conclusion" that Stanley's speech was protected by the First Amendment. See Dartland v. Metropolitan Dade County, 866 F.2d 1321, 1323 (11th Cir. 1989) (stating "the employer is entitled to immunity except in the extraordinary case where Pickering balancing would lead to the inevitable conclusion that the [act taken against] the employee was unlawful"); see also Hansen v. Soldenwagner, 19 F.3d 573, 575-76 (11th Cir. 1994); Sims v. Metropolitan Dade County, 972 F.2d 1230, 1236-37 (11th Cir. 1992); Busby v. City of Orlando, 931 F.2d 764, 773-75 (11th Cir. 1991). As we have said before, "[b]ecause Pickering requires a balancing of competing interests on a case-by-case basis, our decisions tilt strongly in favor of immunity by recognizing that only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights." Hansen, 19 F.3d at 576; see also Dartland, 866 F.2d at 1323-24. Thus, the district court erred in denying Chadwick qualified immunity on this ground as well.

## VI. CONCLUSION

Under our circuit precedent, we conclude that the district court erred in denying Chadwick qualified immunity on Stanley's first amendment claims. Accordingly, to that extent, we reverse the district court's order, dated April 16,

41

1999, denying Chadwick's motion for summary judgment and remand this case for the district court to enter judgment for Chadwick on Stanley's first amendment claims.

**REVERSED AND REMANDED.**