**Roger Allen PATTEE and Kimberly Ann Pattee, Plaintiffs,**

v.

**GEORGIA PORTS AUTHORITY; Douglas J. Marchand, individually and in his official capacity as Executive Director of the Georgia Ports Authority; and David A. Schaller, individually and in his official capacity as Deputy Executive Director of the Georgia Ports Authority, Defendants.**

No. 406CV028.

United States District Court,
S.D. Georgia,
Savannah Division.

Dec. 18, 2006.

A. Lee Parks, Andrew Y. Coffman, Eleanor Mixon Attwood, Steven E. Wolfe, Parks, Chesin & Walbert, PC, Atlanta, GA, for Plaintiffs.

Bradley J. Watkins, Whelchel, Brown, Readdick & Bumgartner, G. Todd Carter, Brown, Readdick, Bumgartner, Carter, Strickland & Watkins, LLP, Brunswick, GA, for Defendants.

## ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

This case arises from Roger Pattee's termination as an officer with the Georgia Port Police (GPP), a department of the Georgia Ports Authority (GPA) that provides general law enforcement at Georgia's ports. Doc. # 1. Pattee outlined security flaws in the Port of Savannah and, after receiving an apathetic response from GPP management, he emailed his opinions to a member of Georgia's Homeland Security Task Force. As a result, the Office of the Inspector General of the State of Georgia investigated the Port. Pattee claims his subsequent termination was in retaliation for his First Amendment-protected emails.

Pattee brought a state-court action alleging a violation of 42 U.S.C. § 1983 by the GPA, GPA Executive Director Douglas Marchand, and GPA Deputy Executive Director David Schaller. Doc. # 1, attach. 1 at 27. Pattee also claimed a violation of the Georgia Whistleblower Act, O.C.G.A. § 45-1-4(GWA), id. at 22-23, and his wife claimed loss of consortium damages caused by the violation of the GWA. Id. at 27-28. Pattee sought actual, compensatory, and punitive damages, as well as declaratory relief. Id. at 28-29. The defendants removed the action to this Court, doc. # 1, and now move for summary judgment. Doc. # 25.

## II. BACKGROUND

Pattee served as a GPP, Port of Savannah officer from 1997 until 3/8/04. Doc. # 25 at 1. On at least five occasions during

that tenure he raised concerns about security deficiencies to his supervisors but was ignored. Doc. # 44 at 1. Out of concern for Port security, Pattee sent a 3/03 email to Stanley Tuggle, Sheriff of Clayton County, Georgia and a member of Georgia's Homeland Security Task Force. Doc. # 44 at 2–3. Eventually the email was forwarded to the Office of the Inspector General of the State of Georgia (OIG). Doc. # 25 at 1.

In that email Pattee related what he termed a problem of "Homeland Security." Doc. # 25, exh. A at 1. Though the GPP is charged with enforcing the law at the Port, he noted, GPP supervisors relegated officers to acting as a private security force for the Port's patrons. *Id.* Pattee told of instances where economic interests trumped law enforcement, including the release of "drunk drivers, suspects of family domestic violence, and ... people [subject to] valid warrants." *Id.* at 1–2. Furthermore, restrictions on the "GCIC/NCIC teletype," a machine used to perform criminal history checks, created a problem with investigating individuals and vehicles at the Port—the teletype was available only during standard business hours on weekdays. *Id.* at 2.

Pattee outlined problems with communication between management and officers, as well as between GPP and other agencies operating at the Port. *Id.* at 3. He pointed out the continuing violation of a Port Authority Rule governing GPP jurisdiction versus private security. *Id.* He presented examples of the shoddy equipment GPP officers are given to work with, including old cars, leaky gate-houses, lack of bullet-proof vests, and 13–plus–year–old

firearms. *Id.* at 4–5. He complained about the delegation of supervision of cargo interchanges from GPP to a private entity, a move he claimed was made because adequate security would "hamper the movement of cargo." *Id.* at 4–5.

Pattee offered suggestions for improving Port security. *Id.* at 5–7. He suggested the addition of canine units, collaboration with U.S. Customs, and riot training. *Id.* at 5–6. At the administrative level, he recommended that GPP be removed from the control of the GPA and be restructured. *Id.* at 6–7. Finally, plaintiff noted that his proposed changes would result in lower pay and benefits for GPP officers like himself; he also presciently stated he would be fired for making the complaint. *Id.* at 7. Despite that risk, he sent the email because "The Port of Savannah is NOT secure. The security and police operations are run by the shipping industry, not law enforcement minded [sic] people." *Id.*[1]

In response to those emails, the OIG investigated the GPA. Doc. # 25 at 2. On 8/29/03, OIG investigator Robert Terjesen interviewed Pattee. Doc. # 44 at 4. During the interview, Terjesen asked Pattee for the names and contact information of GPP officers who could corroborate his allegations. *Id.* Pattee hesitated because of a GPA rule restricting the release of officers' contact information. *Id.* The rule reads:

> No officer of the department will release to the public or any public agency the restricted home telephone number of any other officer of the department

---

1. Pattee sent a second email to Tuggle in 5/03, detailing an incident in which a driver seeking admission to the Port presented GPP officers with "a Georgia drivers license that was held together by tape, and appeared to be parts of three different Georgia drivers licens-

es." Doc. # 25, exh. B at 1. Despite the suspicious circumstances, a superior told the officers to give the man back his license and turn him away without investigation. *Id.* at 2. This email was also forwarded to the OIG. Doc. # 25 at 1.

without the authorization from [sic] their terminal commander.

Doc. # 25 at 2 (quoting GEORGIA PORTS AUTHORITY PORT POLICE DEPARTMENT RULES AND REGULATIONS MANUAL, chap. II, § P2, ¶ 14). In response, Terjesen showed Pattee the Executive Order establishing the OIG which, *inter alia,* requires "every state employee [to] cooperate with, and provide assistance to, the State Inspector General in the performance of any investigation." Doc. # 25, exh. C at 3; Doc. # 44 at 4–5.

In light of that directive, Pattee gave the names. and contact information of fellow officers who had previously complained to Pattee about GPP's inadequacies, knew Pattee was meeting with OIG, and assured Pattee that they would cooperate with OIG. Doc. # 44 at 5. With the exception of one officer, the officers Pattee identified later refused to cooperate with Terjesen (in violation of the Executive Order) out of a fear of GPA retaliation. *Id.* The one who did cooperate did so only on the condition of anonymity. *Id.*

On 11/19/03, Inspector General (IG) James Sehorn and Deputy Inspector General Philip Walker met with Marchand and Schaller to discuss the complaint and concerns about security at the Port. *Id.* at 6. During the meeting Sehorn warned defendants that retaliation against the "whistleblower," whom he did not name, was forbidden. *Id.* A few days after the meeting, GPP Officers Joseph Saunders and Eric Hampton filed complaints against Pattee with GPA supervisors because the OIG had contacted their houses—contact made possible by Pattee's disclosure of their private phone numbers. *Id.* at 7. Marchand and Schaller, having met with Sehorn and Walker, and having read the Executive Order, knew that GPP officers were required to cooperate with OIG, including by disclosing other officers numbers in violation of GPA policy. *Id.* Nonetheless, they conducted an investigation into Pattee's alleged breach of the GPA policy forbidding disclosure of fellow officers' phone numbers. Doc. # 25 at 3.

Pursuant to this investigation, Schaller called Pattee in for an interview on 12/17/03 in which he asked Pattee (1) whether he had violated the GPA policy against releasing fellow officer's phone numbers and (2) whether he had released names or phone numbers of GPP officers to the public or a public agency. Doc. # 25 at 3.[2] Pattee answered both questions in the negative. *Id.* (Pattee claims his answers were truthful either because he did not consider Terjesen "the public or a public agency," or because the rule did not apply because he was directed to cooperate by the Executive Order. Doc. # 44 at 10.) The GPA, believing Pattee's answers were inconsistent with Saunders's and Hampton's complaints, asked all three officers to

---

**2.** Though Pattee now denies the second question was asked, *see, e.g.,* doc. # 44 at 9 ("At no point during the [12/17/03] meeting did Pattee deny releasing Saunders' and Hampton's telephone numbers, nor did Schaller ask Pattee whether he had done so"), his Complaint admits as much. Doc. # 1, attach. 1 at 17 ("Defendant Schaller asked, 'Did you release names or phone numbers of Port Police members to the public or a public agency?' Pattee again answered that he had not."). "A party is normally bound by facts asserted in a pleading. When the pleading is amended, however, the prior statement ceases to be a conclusive judicial admission, but still remains competent, though controvertible, evidence." *Thyssen Elevator Co. v. Drayton–Bryan Co.,* 106 F.Supp.2d 1355, 1361 n. 9 (S.D.Ga.2000) (quotes and cites omitted). Defendants claim the question was whether Pattee had released the names to "anyone," as opposed to "the public or a public agency," thus establishing without question that Pattee lied. The facts on a summary judgment motion, however, must be taken in the light most favorable to the non-moving party, Pattee. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1085 (11th Cir.2004).

submit to a polygraph test. Doc. # 25 at 3.

Pattee arrived with an attorney at the polygraph appointment. Doc. # 44 at 10. The attorney asked the GPA official overseeing the test whether the results might be used against Pattee in a criminal investigation and what consequences would follow if Pattee refused to take the polygraph. *Id.* The official refused to answer those questions, stating that they would need to be reviewed by GPA lawyers. *Id.* Pattee refused to take the polygraph.

Upon hearing about the polygraph, IG Sehorn called Schaller out of concern that the GPA was retaliating against Pattee. Doc. # 46, exh. 20. Sehorn noted that Pattee was not denying that he provided phone numbers to Terjesen during the investigation, and to punish Pattee for releasing the phone numbers would be "countermanding the authority of the Governor." *Id.* Furthermore, Sehorn related the OIG's position on the 12/17/03 meeting to Schaller: Terjesen was not acting as a member of "the public or a public agency," so Pattee had not lied in denying he had not released the phone numbers to the public or a public agency. *Id.*

Despite the phone call from Sehorn, defendants contacted their legal counsel, who opined that it would not be a violation of the law to terminate Pattee for lying. *Id.* at 4–5. On 3/8/04, the GPA terminated Pattee after concluding that he lied to Schaller during the investigation of Saunders's and Hampton's complaints. *Id.* at 4.

In response, Pattee brought this action against the GPA as well as Marchand and Schaller in their individual and official capacities. He claims violations of the First Amendment and the GWA. Doc. # 1. He alleges that he was fired for sending emails to Stanley Tuggle that were critical of the GPA and described major flaws in the security level at the Port of Savannah.

*Id.* The defendants, on the other hand, claim that Pattee was fired for lying during the 12/17/03 meeting with Schaller, so they move for summary judgment against Patee. Doc. # 25.

### III. *ANALYSIS*

#### A. "Persons" Under § 1983

■ The defendants first argue that the GPA, and Schaller and Marchand in their official capacities, are not "persons" within the meaning of § 1983. "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). But municipalities are, *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), since *Will* "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes." *Will*, 491 U.S. at 70, 109 S.Ct. 2304. Thus, whether the GPA is a "person" for purposes of § 1983 turns on whether GPA is more like a municipality or more like the state itself. One consideration is whether the GPA is an arm of the state protected by the Eleventh Amendment. *Id.*

The Eleventh Circuit has not ruled on whether the GPA is an arm of the State protected by the Eleventh Amendment. *Misener Marine Constr., Inc. v. Georgia Ports Auth.*, 199 Fed.Appx. 899, 2006 WL 2918607 at *1 (11th Cir.2006) (unpublished) ("Nothing herein shall be construed as a substantive ruling on whether the GPA is or is not entitled to Eleventh Amendment immunity"). *Hines v. Georgia Ports Authority*, 278 Ga. 631, 604 S.E.2d 189 (2004), however, held that "the Ports Authority is not an arm of the state under the federal law governing Eleventh Amendment immunity." *Id.* at 631, 604 S.E.2d 189.

Though *Hines* is only persuasive on this question of federal law, defendants have

made no attempt to distinguish it, nor have they given any reason for the Court to consider GPA an arm of the state. *See* doc. # 26 at 4 (GPA not a person "[s]ince the [GPA] is an agency of the [S]tate of Georgia"); doc. # 54 ("It is clear that states, state departments and agencies are not considered 'persons' subject to suit under ... § 1983"—no citation). As the burden is on defendants to show they are entitled to summary judgment, the Court adopts the reasoning in *Hines*. Therefore, the Court will treat the GPA like a municipality—a "person" under § 1983.

### B. Qualified Immunity

■ Marchand and Schaller argue that they are entitled to qualified immunity from suit in their individual capacities. When a government official acts within his discretionary authority, as is the case here, the Court must undertake a two-step inquiry: First, do the facts, taken in the light most favorable to the plaintiff, show that the official violated the plaintiff's rights;[3] and second, was the violated right clearly established at the time of the official's acts. *Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1299 (11th Cir.2005). If either question is answered in the negative, the official is entitled to immunity from suit in his individual capacity.

■ The Court turns to the first step, whether the facts as alleged by Pattee establish a constitutional violation. In public-employee, First Amendment retaliation cases, the Court must undertake a four-stage analysis.[4] *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir.1989). The Court must decide, as a matter of law (1) whether the speech can "be fairly characterized as constituting speech on a matter of public concern," *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); and (2) whether "the interests of the [public employee], as a citizen, in commenting upon matters of public concern" outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

If the Court finds that the speech was protected, the fact-finder must determine (3) whether the protected speech was a " 'substantial factor'—or, to put it in other words, that it was a 'motivating factor' in the ... [adverse employment] decision," *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); and (4) whether, in the absence of the protected speech, the

---

**3.** This inquiry will also resolve the argument raised on behalf of all defendants that summary judgment is proper because Pattee cannot show a violation of the First Amendment.

**4.** The recent case of *Garcetti v. Ceballos* will likely be considered to add a fifth stage at the outset of the analysis—whether the plaintiff spoke as a citizen, or as an employee pursuant to official duties. —— U.S. ——, ——, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006). Much of the Eleventh Circuit's complicated "public concern" jurisprudence will likely be simplified by folding it into this new stage. *See, e.g., Maggio v. Sipple*, 211 F.3d 1346, 1352 (11th Cir.2000) (to decide whether the speech was on a matter of public concern, "this Court must discern whether [the plain-

tiff] spoke primarily as a citizen on behalf of the public or primarily as an employee upon a matter of personal interest"); *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir.1993) (speech was not on a matter of public concern because "Morgan primarily spoke as an employee in order to improve her work environment. . . . [T]he main thrust of her speech took the form of a private employee grievance"). For a listing of the categories of speech that would fall within the unprotected speaker *qua* employee category, *see Mitchell v. Hillsborough County*, 468 F.3d 1276, 1285 n. 17 (11th Cir. 2006). Because the defendants do not argue that Pattee's private emails were sent pursuant to official duties, or that the emails concerned "work-a-day matters," *id.*, this stage is satisfied here.

government-employer "would have reached the same decision." *Id.*

### 1. *Public Concern*

In determining whether speech can fairly be characterized as constituting speech on a matter of public concern, the Court must look to "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. If the content of the speech "relat[es] to any matter of political, social, or other concern to the community," it weighs toward holding that the speech can fairly be characterized as a matter of public concern. *Id.* at 146, 103 S.Ct. 1684. Especially considered of public concern is speech "bring[ing] to light actual or potential wrongdoing or breach of public trust," *id.* at 148, 103 S.Ct. 1684; "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance." *Garcetti*, 126 S.Ct. at 1962.

■ In contrast, speech relating to "internal office affairs"—transfer policies, intra-office rumors, morale, etc.—though the public may be interested to hear it, does not relate to a matter of public concern. *Connick*, 461 U.S. at 148–49, 155, 103 S.Ct. 1684. "Content is undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern." *Mitchell*, 468 F.3d 1276, 1284.

■ As to the form of the speech, disclosure to the public—for example a letter to the editor—is more likely to be deemed addressing a matter of public concern than internal employee complaints. *Id.* at 148–49, 103 S.Ct. 1684. The Supreme Court, however, rejected the argument that speech is not a matter of public concern simply because it was made in private, either to an employer, *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), or to a fellow employee, *Rankin v. McPherson*, 483 U.S. 378, 386 n. 11, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

Finally, the context of speech is important in determining whether it can fairly be characterized as a matter of public concern. In the context of an employee complaint or grievance—"a personal employment dispute"—an employee's speech is less likely to be considered of public concern. *Connick*, 461 U.S. at 148–49 & n. 8, 103 S.Ct. 1684.

■ On the other hand, speech made during the course of a discussion of public policy is considered to be on a matter of public concern, no matter how devoid of content. *Rankin*, 483 U.S. at 386, 107 S.Ct. 2891 (holding statement hoping for a successful second attempt on the President's life was on a matter of public concern because it was in the context of "a conversation addressing the policies of the President's administration").

■ The whistle-blowing context strongly weighs in favor of characterizing speech as being on a matter of public concern. *See Garcetti*, 126 S.Ct. at 1962; *Bryson*, 888 F.2d at 1566 ("a core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption").

■ The Eleventh Circuit has also consistently looked to the employee's purpose in speaking to determine whether speech can fairly be characterized as constituting speech on a matter of public concern. *See, e.g., Morgan*, 6 F.3d at 754 ("we must determine whether the purpose of Morgan's speech was to raise issues of public concern, on the one hand, or to further her own private interest, on the other"). It is unclear whether this additional factor is a part of the "context" inquiry, or stands alone as a fourth consideration. The court applies the factor by determining the "main thrust" of the speech. *Id.* at 755.

If the main thrust of the speech was for private gain, the speech will not be considered to be on a matter of public concern, seemingly no matter how strong the other factors weigh in favor of characterizing the speech as a matter of public concern. *Stanley v. City of Dalton, Ga.,* 219 F.3d 1280, 1288 n. 13; *Akins,* 420 F.3d at 1304.[5]

■ The content, form, context, and purpose of Pattee's speech all weigh heavily in favor of characterizing the speech as a matter of public concern. The content of the speech (security conditions at the Port of Savannah) pertains to the important subject of local and national security and brought to light a perceived breach of the public trust—trading public safety for ease of shipping. Though the form of Pattee's speech was not a disclosure to the public, a disclosure of perceived governmental failures to an entity in a position to correct them is akin to a public disclosure.

In addition, the speech was made in the whistleblower context, implicating "a core concern of the first amendment." *Bryson,* 888 F.2d at 1566. Finally, the main thrust of Pattee's emails was to raise issues of public concern, not further his own private interests. Though he asked for better equipment and working conditions at the Port, these improvements were suggested out of a desire for better security, as evidenced by his anticipation of lower pay and benefits should his suggestions be adopted, and his prediction that the complaint would lead to his termination. Therefore, Pattee's speech can fairly be characterized as relating to a matter of public concern.

### 2. *Pickering Balancing*

■ In that Pattee's speech was on a matter of public concern, the Court must balance his First Amendment interest in speaking against the GPA's interest in efficiently running the Port. *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. Under *Bryson,* the Court must consider the effects of the speech and the circumstances surrounding the speech on the provision of public services. 888 F.2d at 1566–67.

In *Bryson,* a city police officer filed a complaint with the city manager alleging that the chief of police had stolen whiskey from the department's evidence room. *Id.* at 1564. The officer also made "bitter complaints to all who would listen" and "openly investigated [the chief] by interrogating members of the police force and tape-recording conversations." *Id.* at 1567, 1564. The court noted that the officer's "animosity toward the chief" caused other officers to avoid the police station and "undermined the morale of the police department." *Id.* at 1567. Therefore, the court considered the city's legitimate reason that the officer did not "confine[ ] his complaint to the proper time, place, and manner," as a surrounding circumstance of the officer's speech that tipped the scales in favor of the city. *Id.*

■ The GPA first argues that the balance weighs in its favor because Pattee was fired for lying, not for his emails. However, Pattee's lie is not a circumstance surrounding the emails like the legitimate reasons given in *Bryson;* it came later in time and was precipitated by, a jury could reasonably conclude, a retaliation-motivated internal investigation—and not Pattee

5. The inquiry into the speaker's purpose seems inapposite to *Connick's* public concern inquiry, which requires only that the speech "be fairly characterized" as relating to a matter of public concern, not that an up or down determination be made between "public con- cern" and "private interest." 461 U.S. at 146, 103 S.Ct. 1684. The speaker's purpose seems more appropriately viewed as a part of the *Garcetti* inquiry—whether the individual spoke as a private citizen. *See supra* note 4.

himself. His "lie" thus is entirely distinct from the speech at issue. It therefore does not weigh in the *Pickering* balance like the "circumstances surrounding" the speech in *Bryson.* *Id.*

The GPA next argues that the balance weighs in its favor because "plaintiff's decision to give out the phone numbers created disharmony among co-workers." Doc. # 26 at 11. Even were the Court to ignore the fact that GPA has consistently denied firing Pattee for giving out the phone numbers, the argument would be foreclosed by *Cooper v. Smith,* 89 F.3d 761, 765 (11th Cir.1996) ("cooperating with law enforcement in investigations of unlawful activity within [plaintiffs'] respective governmental organizations ... is ... one of those 'extraordinary case[s] in which the First Amendment conclusion would inevitably favor [the plaintiff] in light of *Pickering* balancing' ") (quoting *Hansen v. Soldenwagner,* 19 F.3d 573, 578 (11th Cir. 1994)).

Pattee's whistleblowing, like the speech in *Cooper,* is entitled to significant weight in the *Pickering* balance, such that the scales "inevitably" tip in his favor. *See Beckwith v. City of Daytona Beach Shores, Fla.,* 58 F.3d 1554, 1564 (11th Cir. 1995) ("It is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens"). Moreover, the balance is even stronger in Pattee's favor than was the case in *Cooper;* the GPA has made no arguments why Pattee's speech disrupted the efficient operation of the Port, so its side of the scale is empty. Thus, the *Pickering* balance weighs completely in favor of Pattee.

### 3. *Substantial or Motivating Factor*

 The Court next must determine whether Pattee has presented sufficient evidence for a reasonable jury to conclude that his protected speech was a substantial or motivating factor in the decision to terminate him. "[T]he plaintiff's burden in this regard is not a heavy one." *Stanley,* 219 F.3d at 1291. Relevant evidence includes the temporal proximity of the speech to the termination, whether reasons given for the termination are shown to be pretextual, comments or actions indicating that the speech and termination were connected, whether the asserted reason for discharge varied, who instigated internal investigations or termination proceedings, evidence of management hostility to the type of speech in question, and other evidence of an employer's motive to retaliate. *Id.* at 1291 n. 20.

 Pattee has met this minimal burden. He was fired between three and four months after defendants became aware of his contact with OIG. Furthermore, he was targeted with the investigation into the phone number disclosures immediately. Though defendants claim the investigation was undertaken because of a duty to look into all employee complaints, a jury could believe that it was undertaken to manufacture grounds for firing an employee who had engaged in protected conduct. Evidence of the latter includes the fact that the investigation began only a few days after defendants learned of Pattee's speech, and the defendants' admission that they knew at the time the investigation was undertaken that, even were all the information in Saunders's and Hampton's complaints true, Pattee could not have been punished for the disclosure.

Pattee also cites evidence that other officers would not cooperate with the OIG investigators out of a fear of retaliation. This is highlighted by the fact that the only other officer to cooperate with OIG did so on the condition of anonymity. This evidence provides sufficient grounds for a

jury to determine that a substantial or motivating factor in Pattee's termination was retaliating against him for his protected speech.

Defendants next argue that they are due summary judgment because Pattee has no evidence that Marchand and Schaller knew the content of his emails. "It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose v. Twp. of Robinson, Pa.,* 303 F.3d 488, 493 (3d Cir.2002).

This argument has two fatal flaws. First, in *Ambrose* the decisionmakers were ignorant not just of the content of the speech, but that the plaintiff had even engaged in speech—the protected conduct. *Id.* Here, even if the details of Pattee's emails were not known, Marchand and Schaller knew that Pattee complained to the OIG because Saunders and Hampton said as much in their complaints. *See* doc. # 25 exhs. D–E (complaining that OIG contacted them because Pattee complained to OIG).

Second, on 11/19/03 Sehorn and Walker, representing the OIG, outlined the deficiencies in Port security alleged by a "whistleblower" to Marchand and Schaller. Less than a week later, defendants received Saunders's and Hampton's complaints identifying Pattee as the whistleblower. A jury can connect these dots and reasonably conclude that these defendants indeed had a rough idea of the content of Pattee's emails.

■ Defendants next argue that Pattee was fired for lying, not for his protected speech. Having a legitimate reason for firing an individual does not foreclose a jury's finding that protected conduct was also a substantial or motivating factor in the decision. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Cases in which the jury believes legitimate and non-legitimate reasons motivated the decision are deemed "mixed-motive" cases.

Furthermore, Pattee's allegations, if proved at trial, would authorize a jury to conclude that the claim that Pattee was fired for lying was a pretext. That is, the investigation into the phone number disclosure and allegation of lying did not motivate the termination at all, but were reasons manufactured to cover the illegitimate reason for his termination—retaliation for his emails. He claims that in interviewing him, Schaller merely quoted the language of the rule forbidding disclosure of phone numbers. If Pattee agreed that he violated the rule, he would be terminated for that violation, *see* doc. # 46, exh. C (Marchand deposition) at 107 (acknowledging that Pattee would have been disciplined had he admitted disclosing the phone numbers at the 12/17/03 meeting); if Pattee denied violating the rule, he would be (and was) terminated for lying. Thus, none of defendants' arguments show that they are entitled to judgment as a matter of law.

### 4. *Same–Decision Defense*

■ Defendants' argument that Pattee's speech was not a motivating factor because he was fired for lying could also be interpreted as an argument that the same decision would have been made absent the protected speech. While the defendants did not formally raise this issue in their summary judgment brief, the Court will address it. To succeed with this affirmative defense, defendants must prove by a preponderance of the evidence that they would have taken the same action absent the protected speech. To succeed at the summary judgment stage, defendants must show that there is no issue of fact that they would have taken the same action. *Stanley,* 219 F.3d at 1292.

██ Defendants allege that "[t]he [GPA] has a very low threshold for lying, and has terminated numerous employees in the past for lying." Doc. # 25 at 4. Additionally, they state that "it was determined that plaintiff Roger Pattee had lied." *Id.* As a threshold matter, Pattee claims that both of these statements are contested issues of material fact.

First, Pattee claims that the sole evidence presented that defendants take a hard-line on lying is a list of 13 GPA employees fired for lying. But the circumstances of the terminations are not shown, Patee points out, and they thus could be dissimilar to this case. Furthermore, the fact that defendants have fired 13 employees for lying says nothing about whether they have pardoned other employees that have lied.

Second, Pattee claims the defendants never determined he was lying. Rather, they knew he disclosed numbers to Terjesen, but that he denied violating the policy or disclosing numbers to "the public or a public agency" because of his own interpretation of the coverage of the rule. The phone call between Schaller and Sehorn after the polygraph test evidences the fact that defendants knew Pattee was not denying leaking the numbers and knew the OIG and Pattee did not consider the exchange on 12/17/06 a lie. In other words, it is possible that defendants did not believe Pattee lied, but believed they could label the exchange at the interview a lie and use it as a pretext to fire him.

More importantly, even were both of these statements uncontested, they would not meet defendants' burden. A jury faced with the facts that (1) defendants take a hard-line on liars, and (2) defendants determined that Patee lied, could still decide that under the circumstances Pattee would not have been fired absent his protected speech. As the Eleventh Circuit has noted:

> Lies by a police officer can alone be sufficient to support termination and can carry the day under the fourth prong in certain circumstances. However, here, [the plaintiff]'s deception concerned [a minor issue], rather than any form of criminal activity or sexual harassment of other employees. Thus, while [the defendant] has presented sufficient evidence to create a jury issue on the fourth step's affirmative defense, his evidence is not strong enough to warrant judgment as a matter of law. While the deception alone was an adequate lawful basis to terminate [the plaintiff], we cannot say as a matter of law that [the defendant] necessarily would have done so absent [plaintiff's protected speech].

*Stanley*, 219 F.3d at 1294 (Hull, J.). Thus, questions of material fact prevent summary judgment for defendants on the "same decision" affirmative defense.

Because Pattee has established that his emails can be fairly characterized as relating to a matter of public concern, that *Pickering* balancing tips in his favor, and that questions of material fact remain on prong (3) and (4) of the inquiry, the defendants are not entitled to summary judgment.

██ The defendants in their individual capacities, however, will be entitled to qualified immunity if they did not violate "clearly established" law in terminating Pattee.

> The question is not whether a reasonable [here, GPA official] would know the general principle that it violates the law to terminate a public employee in retaliation for protected speech. Instead, here, the issue is fact specific: in [2004], would a reasonable [GPA official] have known that terminating a subordinate officer in this particular factual context violated clearly established law.

*Stanley,* 219 F.3d at 1294. Marchand and Schaller raise two arguments that they are entitled to qualified immunity. First, given *Pickering's* case-by-case balancing, "only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights." *Hansen,* 19 F.3d at 576. Second, defendants are entitled to qualified immunity where it is undisputed that their actions were motivated, at least in part, by legitimate factors. *Stanley,* 219 F.3d at 1295–96; *Foy v. Holston,* 94 F.3d 1528 (11th Cir.1996).

■■■■ The Court concludes that this is "the *extraordinary* case where *Pickering* balancing would lead to the *inevitable* conclusion that the act taken against the employee was unlawful." *Hansen,* 19 F.3d at 576 (quotes and alterations omitted). As the court stated in *Beckwith,* "[i]t is hard to imagine any combination of government interests sufficient to outweigh Appellant's strong interest in informing the public about policies he believed were dangerous to the City's citizens." 58 F.3d at 1564. Here, though Schaller and Marchand may have reasonably believed their conduct did not violate clearly established law, it was certainly not because they believed their interest in efficiently running the Port outweighed Pattee's interest in privately communicating serious concerns about Port security to government investigators. This is especially true given that they raise *no* reason why Pattee's emails interfered with the efficient operation of the Port.

Defendants next argue that *Foy* and *Stanley* require qualified immunity in circumstances such as these. It is true that "when an adequate lawful motive is present, [the fact] that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage." *Foy,* 94 F.3d at 1534–35. And it is also true that, "[w]here the facts assumed for summary judgment purposes in a case . . . show mixed motives . . . and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity." *Id.* at 1535.

However, *Foy* only applies where the undisputed summary judgment facts establish mixed motives, as opposed to pretext. *Stanley,* 219 F.3d at 1296. Such a result is shown where it is undisputed that (a) objectively valid reasons exist for the termination, and (b) the termination was motivated, at least in part, by the objectively valid reason. *Id.* But where (b) is disputed, the case retains the possibility of being a pretext case—objectively valid reasons for termination exist but did not motivate the termination. *See id.* at 1297 n. 29 ("We emphasize that it is not sufficient . . . to establish that there exists a lawful basis for a reasonable police chief to have terminated Stanley. Rather, in order for the *Foy* analysis to apply, [the chief] himself must have been actually motivated, at least in part, by that lawful basis").

Here, Pattee disputes that his exchange with Schaller played any part in the decision to terminate him and credibly alleges that it was merely a manufactured pretext. Thus this case, unlike *Foy* and *Stanley,* is not undisputedly a mixed-motives case. In *Stanley,* the plaintiff made protected statements to the GBI in 1993 that the police chief might have stolen money from the department evidence room. 219 F.3d at 1288. In 1997 the police chief fired the officer after the plaintiff lost his temper with a coworker, used profanity during the exchange, and later lied about it. *Id.* at 1284. The court held that the plaintiff established a First Amendment claim sufficient to survive summary judgment based on his 1993 accusation of the chief. *Id.* at 1294.

The court nonetheless held that the chief was entitled to qualified immunity because

the case was indisputably one of mixed motives. *Id.* at 1297–98. The key to *Stanley* was that, while the court could not "say on the underlying constitutional claim ... that it is undisputable that Stanley would have reached the same decision totally *absent* the protected speech, [the court could] say that it is undisputable that, even given that speech, [the chief] would not have terminated [the officer] in 1997 *absent* the 1997 incidents." *Id.* at 1297. Because four years passed since the speech, and the defendant was fired immediately after the 1997 incidents, it was undisputed that those incidents were part of the chief's motivation in firing the officer. *Id.* Thus, the case was one of mixed motives, not pretext.

Here, there is no similar ground to conclude that Pattee's lie, even if it were an objectively valid reason for termination, undisputedly motivated the decision to fire Pattee. Pattee was fired soon after both the exchange with Schaller and the defendants' discovery of his protected speech. A jury could find that Pattee's lie provided an objectively valid reason for the termination, but it did not motivate the defendants at all. Because it is disputed whether the exchange with Schaller motivated the defendants to terminate Pattee, the defendants are not entitled to qualified immunity under *Foy* and *Stanley.*

■ Finally, the defendants argue that they are entitled to qualified immunity because they relied on an attorney's advice that terminating Pattee for lying would not violate his constitutional rights. In *V–1 Oil Co. v. Wyoming,* 902 F.2d 1482 (10th Cir.1990), the court applied "the 'extraordinary circumstances' exception to the rule that a qualified immunity defense fails where the defendant violated a clearly established right." *Id.* at 1488; *see Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("if the

official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained").

The *V–1* court held the defendant's receipt of legal advice constituted an extraordinary enough circumstance to grant qualified immunity in the face of a violation of a clearly established right. *Id.* at 1489. The defendant "was advised by fully informed, high-ranking government attorneys that a particular statute, which had not yet been tested in any court, lawfully authorized [a] particular search." *Id.* Judge Ebel dissented, noting that "[i]f the Supreme Court intended legal advice, without more, to be sufficient, it surely would have said so in *Harlow,* or it would have used some words other than 'extraordinary' circumstances." *Id.* at 1490 (Ebel, J. dissenting).

Defendants point to no Eleventh Circuit case applying the "extraordinary circumstances" exception, nor any case granting a defendant qualified immunity for relying on the advice of private counsel. Furthermore, even were the Court to find *V–1* persuasive, the legal advice in that case was *extraordinary*—from a high-ranking government attorney and regarding an untested statute—not the run-of-the-mill advice defendants received from their attorney in this case. Thus, the defense does not apply here.

Finally, the advice received would not provide a defense in this case. Defendants' attorney "advised the [GPA] that in [his] opinion it would not be a violation of Sgt. Pattee's rights under the First Amendment to the United States Constitution ... to terminate him *for making a false statement.*" Doc. #25, exh. F at 3 (affidavit of attorney G. Paris Sykes, Jr.) (emphasis added). Of course this advice is true, but it does not aver that the behavior Pattee alleges was legal. Again, this could

be a pretext case; Pattee makes a claim, supported by sufficient evidence to get to a jury, that the defendants did not fire him for making a false statement, but rather for airing his Port safety concerns. Thus, though the legal advice is sound that Pattee could be fired for making a false statement, it provides no defense to the allegation that Pattee was not fired for making a false statement. Defendants therefore are not entitled to qualified immunity.

## C. Punitive Damages

■ The defendants also move for summary judgment on Pattee's punitive damages claims. "[P]unitive damages are not available under § 1983 from a municipality, *Newport v. Fact Concerts, Inc.,* 453 U.S. 247[271], 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), but are available in a suit against an official personally, see *Smith v. Wade,* 461 U.S. 30[56], 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)." *Kentucky v. Graham,* 473 U.S. 159, 167 n. 13, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Because Pattee's suit against the GPA is akin to a suit against a municipality, *see supra* section III(A), the GPA and the individual defendants in their official capacities are immune from punitive damages.

■ As to Schaller and Marchand in their individual capacities, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Wade,* 461 U.S. at 56, 103 S.Ct. 1625. Pattee, defendants argue, admitted that defendants never expressed any hostility to him, so they maintain that they cannot be deemed to have had an evil motive or intent. But defendants fail to demonstrate why a jury

could not find that their actions showed "reckless or callous indifference" to Pattee's rights. Thus, summary judgment on this issue (punitive damages against these defendants in their *individual* capacities) is improper.

## D. GWA Sovereign Immunity

■ The defendants next argue that summary judgment is appropriate on Pattee's Georgia Whistleblower Act, O.C.G.A. § 45–1–4(GWA) claim because the GPA is entitled to sovereign immunity which has not been waived. "[T]he Georgia Ports Authority is a state 'department or agency' that is entitled to the defense of sovereign immunity under ... the Georgia Constitution." *Miller v. Ga. Ports Auth.,* 266 Ga. 586, 589, 470 S.E.2d 426 (1996). Defendants claim that because the Georgia Tort Claims Act constitutes the exclusive waiver of Georgia's sovereign immunity, the State is immune from suit under the GWA. The Court rejects these arguments. "The right of action provided in the [GWA] is a waiver of the State's sovereign immunity independent of the waiver in the Georgia Tort Claims Act...." *Moore v. Gabriel,* 2005 WL 3455874 at *5 (M.D.Ga. Dec. 15, 2005) (unpublished).

## E. GWA Statute of Limitations

■ Effective 7/1/05, the GWA was amended to require that suits be brought "within one year after discovering the retaliation or within three years after the retaliation, whichever is earlier." O.C.G.A. § 45–1–4(e)(1); *see* Georgia General Assembly—HB 665, http://www.legis.ga. gov/legis/2005_06/search/hb665.htm (last visited 12/18/06). Defendants argue that because the amendment became effective before Pattee filed suit, the new statute of limitations operates to bar his GWA claim.[6]

---

6. Defendants do not argue that Pattee's suit was untimely under the previously existing

version of the GWA.

In Georgia, laws are generally prospective in application. O.C.G.A. § 1–3–5. However, "[l]aws looking only to the remedy . . . may apply to . . . rights . . . accrued . . . prior to their passage; but in every case a reasonable time subsequent to the passage of the law should be allowed for the citizen . . . to protect his right." *Id.* "Statutes of limitation look only to remedy and not to substantive rights, and thus under certain conditions can be applied retroactively." *LFE Corp. v. Edenfield,* 187 Ga.App. 785, 787, 371 S.E.2d 435 (1988). Thus, it is possible that the subsequently enacted statute of limitations applies to bar Pattee's claim.

"Generally statutes prescribe for the future and that is the construction to be given unless there is a clear contrary intention shown. A statute is never to be given a retroactive operation unless such construction is absolutely demanded." *Wausau Ins. Co. v. McLeroy,* 266 Ga. 794, 796, 471 S.E.2d 504 (1996) (quotes and cites omitted). "Statutes of limitation should not be applied retroactively unless the legislature expressly provides for retroactive application or unless the examination of the statute as a whole clearly demonstrates an intent by the legislature for retroactive application." *McNeal Const. Co. v. Wilson,* 271 Ga. 540, 541, 522 S.E.2d 222 (1999). Defendants point to no legislative text or history, and this Court finds none, "absolutely demand[ing]" that the newly enacted statute apply retroactively. Thus, defendants' limitations argument fails.

### F. GWA Damages

Prior to its 2005 amendment, the GWA did not provide for money damages but instead authorized only reinstatement. *Hughes v. Ga. Dep't of Corr.,* 267 Ga.App. 440, 442, 600 S.E.2d 383 (2004). As amended, the GWA now allows:

(A) An injunction restraining continued violation of [the GWA];

(B) Reinstatement of the employee to the same position held before the retaliation or to an equivalent position;

(C) Reinstatement of full fringe benefits and seniority rights;

(D) Compensation for lost wages, benefits, and other remuneration; and

(E) Any other compensatory damages allowable at law.

O.C.G.A. § 45–1–4(e)(2). The amended statute also provides for the recovery of "attorneys fees, court costs, and expenses to a prevailing public employee." O.C.G.A. § 45–1–4(f). Thus defendants argue that, as to damages, the GWA amendments *do not* apply retrospectively.

As discussed *supra,* Georgia laws affecting only the remedy may apply retrospectively, but only if "such construction is absolutely demanded." *Wausau Ins. Co.,* 266 Ga. at 796, 471 S.E.2d 504. As with the statute of limitations, this Court can find nothing to suggest that the legislature demanded that the new remedies under O.C.G.A. § 45–1–4(e)(2) & (f) apply retroactively. Thus, Pattee is limited to the pre-amendment GWA remedies. *See Minter v. Tyson Foods, Inc.,* 271 Ga.App. 185, 188, 609 S.E.2d 137 (2004) (injuries occurred prior to enactment of statute allowing recovery of attorney's fees, so recovery of attorney's fees was foreclosed).

### G. GWA Merits

Defendants argue that Pattee's GWA claims fail because Pattee's whistleblowing was not directed at "a violation or noncompliance with a law, rule, or regulation" as required by the GWA. O.C.G.A. § 45–1–4(d)(2). " 'Law, rule, or regulation' includes any federal, state, or local statute or ordinance or any rule or regulation adopted according to any federal, state, or local statute or ordinance." O.C.G.A. § 45–1–4(a)(2). The Court need not address the scope of the definition of "law,

rule, or regulation," since Pattee's email contained specific references to violations of several GPA rules, as well as general references to violations of "POST regulations/state law."[7] Doc. # 25, exh. A at 2. Because Pattee's whistleblowing dealt with a "law, rule, or regulation," this argument, too, is rejected.

## H. Declaratory Judgment

■ Pattee seeks a declaratory judgment stating that the GPA's phone number policy violates O.C.G.A. § 45–1–4(d)(1), which bans any "policy or practice preventing a public employee from disclosing a violation of or noncompliance with a law, rule, or regulation." *Id.* As defendants point out, the policy restricts disclosing *phone numbers*, not rule violations. Thus, defendants are entitled to summary judgment on the second claim (e) in the Complaint. *See* doc. # 1, attach. 1 at 29 (two claims labeled "(e)").

■ Defendants also move for summary judgment on Pattee's claim for declaratory relief regarding the Executive Order creating the OIG. Pattee seeks "[a] judgment declaring that the Defendants violated Section 5 of the Governor's Executive Order ... by adopting and enforcing policies which would require any employee of GPA to obtain permission before providing information to OIG." *Id.* Section 5 of the Executive Order requires that "[e]ach state agency and every state employee ... cooperate with, and provide assistance to, the [OIG] in the performance of any investigation." Doc. # 46, exh. 8 at 3.

The Executive Order deals with state agencies and state employees vis-a-vis the OIG. It provides no standards controlling the relationship of the state employee vis-a-vis his employing agency. Thus, it cannot be said that a rule governing the relationship between a state agency and its employees "violates" the directive. It is possible that the Executive Order trumps an agency's internal rules, such that an employee cannot be disciplined for violating an internal rule when that employee was complying with the Executive Order. That is far different from declaring the rule invalid because it could be trumped in some circumstances—the relief Pattee seeks. The GPA has apparently seen the writing on the wall with regard to punishing employees for complying with the Executive Order; it does not argue that Pattee was fired for violating the phone policy, but rather for lying. *See also* doc. # 46, exh. B (Schaller deposition) at 77 (stating, in effect, that Executive Order trumps internal GPA rule against phone number disclosure); *id.,* exh. C (Marchand deposition) at 107 (stating, in effect, that Executive Order does not trump internal GPA rule). Therefore, summary judgment to the defendants is proper on claim (f) in the Complaint. *See* doc. # 1, attach. 1 at 29.

## I. New Argument

Defendants filed a reply brief on 12/11/06 raising a new argument for summary judgment on Pattee's GWA claim. Doc. # 54 at 5–7. The Court will defer ruling on this argument until Pattee has had an opportunity to respond.[8] In addition, the Court will defer ruling on the defendants' motion for summary judgment on Kimberly Pattee's loss-of-consortium claim. The resolution of that motion could depend on how this Court decides defendants' new argument. In the meantime, Pattee shall have 20 days from the date of

---

7. "POST" is the "Georgia Peace Officer Standards and Training Act." O.C.G.A. § 35–8–1.

8. While the Court has a liberal briefing rule, *see Podger v. Gulfstream Aerospace Corp.,* 212 F.R.D. 609, 609 (S.D.Ga.2003) ("parties may file as many reply briefs as they want"), it has not yet clarified whether new arguments may be raised within such briefs without good cause.

this Order to respond to defendants' reply brief.

## IV. *CONCLUSION*

The motion (doc. # 25) for summary judgment of defendants Georgia Ports Authority, Douglas Marchand, and David Schaller is ***GRANTED IN PART, DENIED IN PART*** and ***DEFERRED IN PART***. Defendants are awarded summary judgment against plaintiff Roger Pattee on his claims for (1) punitive damages against the defendants in their official capacities; (2) relief as provided by the 2005 amendments to the Georgia Whistleblower Act; (3) declaratory judgment under the Georgia Whistleblower Act; and (4) declaratory judgment pursuant to the Georgia Governor's Executive Order creating the Office of the Inspector General. Pattee shall comply with the briefing direction set forth above.